1  MICHAEL D. ROUNDS, ESQ., Nevada Bar No. 4734
    mrounds@bhfs.com
2  STEVEN A. CALOIARO, ESQ., Nevada Bar No. 12344
    scaloiaro@bhfs.com
3  BROWNSTEIN HYATT FARBER SCHRECK, LLP
    5371 Kietzke Lane
4  Reno, NV  89511
    Telephone:  775.324.4100
5  Facsimile:  775.333.8171

6  *Attorneys for Plaintiff SATA GmbH & Co. KG*

7

8                    **UNITED STATES DISTRICT COURT**

9                         **DISTRICT OF NEVADA**

10  SATA GmbH & Co. KG, a German company,        Case No. 2:15-cv-02111

11                    Plaintiff,                  **PLAINTIFF'S EMERGENCY**
                                                  ***EX PARTE* MOTION FOR**
12        v.                                      **TEMPORARY RESTRAINING**
                                                  **AND SEIZURE ORDER AND FOR**
13  ZHEJIANG REFINE WUFU AIR TOOLS CO.,          **PRELIMINARY INJUNCTION**
    LTD., AND PRONA TOOLS, INC., ROES I-X,
    inclusive,
14                    Defendants.                 **(Special Expedited Review Requested)**

15

16        Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Lanham Act (15 U.S.C. §

17  1116), the Patent Act (35 U.S.C. § 283), and Local Rule 7-5, Plaintiff SATA GmbH & Co. KG

18  ("SATA") respectfully moves the Court for an emergency, *ex parte*, temporary restraining and

19  seizure order and a preliminary injunction against Defendants ZHEJIANG REFINE WUFU AIR

20  TOOLS CO., Ltd. ("WUFU") and PRONA TOOLS, Inc. ("Prona") (sometimes collectively

21  referred to herein as "Defendants").  This Motion is supported by the Declaration of Daniel Maier

22  ("Maier Decl."), the exhibits attached thereto, the following Memorandum of Points and

23  Authorities, and any oral argument the Court may request.

24              **I.        BASIS FOR EMERGENCY *EX PARTE* RELIEF**

25        SATA is seeking emergency relief on an *ex parte* basis because, right now, at the

26  Automotive Aftermarket Products Expo (the "AAPEX") trade show, which ends this Thursday,

27  WUFU is a foreign company exhibiting and offering products for sale that infringe SATA's

28  federally registered U.S. trademarks and design patents.  WUFU possesses evidence of product

018482\0001\13761688.3

sales that could easily be destroyed if it were provided with notice of this motion and a seizure does not occur.  Maier Decl. ¶¶ 13, 23.

Additionally, at the SEMA trade show, which ends this Friday, Prona is a foreign company exhibiting and offering products for sale that infringe SATA's federally-registered U.S. trademark.  Prona has evidence of product sales that could easily be destroyed if it were provided with notice of this motion and a seizure does not occur.  Maier Decl. ¶¶ 20, 23.

The AAPEX and SEMA trade shows are two of the largest annual trade shows canvassing the $477 billion automotive aftermarket industry.  *Id.* at ¶¶ 12, 18.  Exhibitors at both shows generate business (*i.e.*, buy and sell products) and develop and maintain business relationships with key customers and suppliers.  *Id.*  AAPEX is currently being held between Tuesday, November 4, 2014, and Thursday, November 6, 2014, at the Las Vegas Sands Expo Center in Las Vegas, Nevada, and features approximately 2,200 exhibitors and over 39,000 targeted buyers.  *Id.* SEMA is currently being held between Tuesday, November 3, 2015, and Friday, November 6, 2015, at the Las Vegas Convention Center in Las Vegas, Nevada, and features approximately 60,000 qualified buyers and over 130,000 industry professionals.  *Id.* at ¶ 18.

On November 3, 2015, while touring both trade shows, representatives from SATA discovered the Defendants advertising and offering for sale products which infringe SATA's federally registered trademark and patent rights.  *Id.* at ¶¶ 16-17, 21.  These companies are foreign companies from south Asia, either China or Taiwan, and Canada.  *Id.* at ¶¶ 13, 19.  One of SATA's major business challenges and a significant threat to its market is the manufacture and sale of infringing products from China, Taiwan, and Canada.  *Id.*  None of the Defendants appear to have a known regular presence in the United States.  *Id.* at ¶¶ 13, 20 & WUFU's Business Card at Ex. C and Defendant's Brochure at Ex. E.  Once AAPEX is over (this Thursday) and the SEMA is over (this Friday), the Defendants will leave the United States, presumably with orders for products that infringe SATA's trademarks and design patents, and will continue to sell infringing products from their business locations in Wenling City, Zhejiang Province, China, Taiwan, and Toronto, Canada directly or through distributors into the United States.  *Id.* at ¶¶ 13, 20.

1    Accordingly, it is imperative for SATA to serve these companies with a civil action when

2  they are in the United States to stop them from selling counterfeit and infringing products, and so

3  that SATA can obtain evidence identifying the individuals and companies that are purchasing the

4  Defendants' counterfeit products so that they can be stopped as well.  SATA unfortunately knows

5  this process all too well.  *Id.* at ¶ 23.

6    Good cause exists for not providing Defendants with advance notice of this motion.  If the

7  Defendants receive advance notice of this motion and the requested seizure order, there is a

8  significant likelihood that that Defendants will remove, hide, or destroy evidence.   Indeed,

9  Defendants are engaged in willful infringement of SATA's intellectual property.  *Id.* at ¶¶ 15-17,

10  21-22.  Defendants' blatant disregard for SATA's intellectual property rights demonstrates an

11  unwillingness to comply with U.S. law and a likelihood that Defendants will either hide, destroy,

12  or remove evidence from the United States, never to return.  *Id.* at ¶¶ 13, 20, 24.

13    Defendants' rights will be adequately protected.   To ensure that each Defendant has

14  sufficient notice of the temporary restraining and seizure order, in addition to effecting personal

15  service, SATA will promptly provide each Defendant with notice through electronic mail and

16  international FedEx to its foreign address.  Further, because SATA expects that no seizure can

17  reasonably be scheduled and coordinated before Wednesday or Thursday (the last day of the

18  AAPEX show), any supposed prejudice to Defendants is minimal.  However, to ensure that each

19  Defendant has an adequate opportunity to be heard on the temporary restraining and seizure

20  order, SATA will not oppose a hearing on any motion to dissolve the TRO in less than the two-

21  day notice period required by Rule 65 of the Federal Rules of Civil Procedure.   In addition,

22  SATA is prepared to make an immediate cash deposit with the Clerk of the Court to provide

23  security against any damages Defendants may suffer in the unlikely event that the seizure is later

24  found to be improper.

25    Finally, this Court has granted *ex parte* TROs and seizure orders in similar cases and in

26  similar circumstances involving foreign companies appearing at Las Vegas trade shows,

27  including cases where SATA was the plaintiff.  *See, e.g., SATA GmbH & Co. KG v. Wenzhou*

28  *T&E Industrial Co., Ltd. et al,* 2:13-CV-02042 (D. Nev. 2013); *Otter Products, LLC v. Anke*

*Industrial Group Limited*, 2:13-cv-0029 (D. Nev. 2013); *NIKE, Inc. v. QiLoo Intern'l Ltd.*, 2:12-cv-00223 (D. Nev. 2012); *Lifetime Products, Inc. v. Ningbo Wanxiang Plastics Products Co.*, 2:10-cv-01166 (D. Nev. 2010); and *NIKE, Inc. v. Meitac Int'l*, No. 2:06-00943-PMP-PAL, 2006 WL 3883278 (D. Nev. 2006).   The seizure orders in these cases authorized the Plaintiff to seize the Defendants' counterfeit products as well as evidence of the Defendants' infringement by seizing, copying, and returning documents and computers obtained from the Defendants at the trade show.   Accordingly, SATA is not seeking any relief that exceeds the bounds of relief previously granted by this Court in similar circumstances.

**II.   STATEMENT OF FACTS**

**A.   Background on SATA**

SATA is a German corporation established in 1907 under the laws of Germany.   Maier Decl. ¶ 2.   SATA is a leading manufacturer of paint spray guns and related equipment principally used to paint automobiles.   *Id.* at ¶ 3.   SATA's products are designed and manufactured in Germany and are sold to distributors worldwide.   *Id.* at ¶ 4.

Over the past century, SATA has been a leader in the production of paint spray guns and related equipment.   *Id.* at ¶ 5.   SATA's paint spray guns are highly valued, well known for their quality, performance, and durability, and are used by professional car repair businesses, automobile manufacturers, yacht and boat builders, carpenters, painters, airbrush/design creators, and hobbyists worldwide.   *Id.*   SATA offers a wide variety of paint spray guns, including HVLP (high volume, low pressure), RP (reduced pressure) and paint spray guns for automatic painting systems (*e.g.*, robots).   *Id.* at ¶ 6.   SATA's strong reputation and goodwill in the industry is further bolstered by its strong commitment to aiding users of SATA products through free online services, such as tips for painting, a forum for discussion, useful measurement calculators, video tutorials, and even an encyclopedia of terms.   *Id.* at ¶ 7.

*1.   SATA's Trademark Rights*

SATA owns approximately one hundred (100) United States trademark registrations for a variety of trademarks used in connection with SATA's products (hereinafter the "SATA Marks").   (Maier Decl. ¶ 8.)   The SATA Marks at issue in this case are:

- U.S. Trademark Registration No. 3,072,417, a design mark for a band of **red** color extending around the circumference of a paint reservoir for a paint spray gun.  The band of **red** color extends around the circumference of the paint reservoir directly under the screw cap and has a width of approximately 5-20 mm, covering "PAINT SPRAY GUNS AND PARTS THEREOF";

- U.S. Trademark Registration No. 2,770,801, a design mark for a **green** band of color extended around the circumference of a paint spray gun air cap ring, the **green** band being narrower than the air cap ring, covering "paint spray guns"; and

- U.S. Trademark Registration No. 2,793,583, a design mark for a band of [any] color extended around the circumference of a paint spray gun air cap ring, the color band being narrower than the air cap ring and of a color that contrasts with the air cap ring, covering "paint spray guns."

True and accurate copies of the foregoing U.S. trademark registration certificates are collectively attached as Exhibit A to the Maier Declaration.

### 2.      SATA's Asserted Design Patents

In addition to its federal trademark registrations, SATA also possesses substantial patent rights including, without limitation, twenty-five patents (both utility and design) registered with the United States Patent and Trademark Office (hereinafter the "SATA Patents").  Maier Decl. ¶ 10.  In this case, only design patents are at issue.  *Id.*  The design patents at issue are:  USD 459,432 S1, USD 459,433 S1, and USD 644,716 and are described in order below:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- **USD 459,432 S1**:

Claim:  The ornamental design for a **spray gun head ring**, as shown and described.



FIG. 1

### Relevant Description:

Those portions of the structures shown in the drawings in form of broken lines represent parts of the gun other than the spray head ring.  The specific shape of these parts do not limit the present design.  Diagonal hatching in the figures represents **any shade of green coloration**.  Open areas adjacent the diagonal hatching signify surface finish(es) that is/are colored or uncolored, including metallic finish, such as chrome, nickel or any other silvery, metallic finish.

- **USD 459,433 S1**:

Claim:  The ornamental design for a **spray gun head ring**, as shown and described.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1
2
3
4
5
6
7
8
9



F I G.  I

10 <u>Relevant Description:</u>

11 Those portions of the structures shown in the drawings in form of broken lines represent

12 parts of the gun other than the spray head ring.  The specific shape of these parts do not

13 limit the present design.  **Solid black shading represents color contrast in the sense**

14 **that the area(s) so shaded, which may be of any "color"**, for example red, blue or

15 black, is/are in color contrast with adjacent areas of the design.  Open areas adjacent the

16 solid black shading signify surface finish(es) that is/are colored or uncolored, including

17 metallic finish, such as chrome, nickel or any other silvery, metallic finish.

18 •      **USD 644,716**

19 Claim: The ornamental design for a paint spray gun, as shown and described.

20
21
22
23
24
25
26
27



28

Relevant Description:

The stippling used on the air cap ring and on the handle represents a surface having a color.  In particular, where the stippling is the same, the color is the same and where the stippling is different, the color is different.

True and accurate copies of SATA's design patents are collectively attached as Exhibit B to the Maier Declaration.

**B.      The 2015 AAPEX Trade Show**

The AAPEX trade show is one of the largest annual trade shows canvassing the $477 billion automotive aftermarket industry.  Maier Decl. ¶ 12.  Manufacturers and suppliers who attend AAPEX represent everything from air conditioning to computer systems, to paint and body.  *Id.*  Exhibitors at AAPEX generate business (*i.e.*, buy and sell products) and develop and maintain business relationships with key customers and suppliers.  *Id.*  AAPEX is currently being held between Tuesday, November 3, 2015, and Thursday, November 5, 2015, at the Las Vegas Sands Expo Center in Las Vegas, Nevada, and features approximately 2,200 exhibitors and over 39,000 targeted buyers.  *Id.*; *see also* AAPEX Website, available at http://www.aapexshow.com/15/public/enter.aspx.

*1.*      **SATA Discovers Infringing Activity At the AAPEX Trade Show**

On November 3, 2015, a SATA Representative attended the AAPEX trade show.  Maier Decl. ¶ 13.  While at the show he visited several exhibitor booths, and observed one company advertising and offering to sell paint spray guns which infringe SATA's trademark and patent rights.  *Id.*  This company is named WUFU.  *Id.* at ¶13.  One of SATA's major business challenges and a significant threat to its market is the manufacture and sale of infringing products from China and Taiwan.  *Id.*  WUFU is a Chinese company who does not appear to have a known regular presence in the United States.  *Id.*  Once AAPEX is over (this Thursday), WUFU will leave the United States, presumably with orders for products that infringe SATA's trademarks and design patents, and will continue to sell infringing products from their business locations in China directly or through distributors to the United States.

### *WUFU's Infringing Conduct*

WUFU is currently advertising and offering paint spray guns and related products for sale at AAPEX Booth No. 7307.  *Id.* at ¶ 15.  The booth is staffed by several persons.  SATA representatives were given the business card of Mr. Billy Huang, which lists an address for WUFU in China.  *Id.* and Ex. C.  SATA representatives obtained a copy of a brochure that WUFU was distributing to the buyers and others who visit its booth.  *Id.*  The brochure has several pages, is printed in color, and identifies WUFU's products by name, picture, and product number.  *Id.*  After reviewing these materials, SATA determined that WUFU is committing separate acts of infringement across three separate products.

SATA discovered that, listed in WUFU's brochure, are paint spray gun reservoirs being offered for sale having a **green** band of color extending around the circumference of the air cap ring and/or head ring, infringing SATA's trademarks:  U.S. Trademark Registration No. 2,770,801 (for the green air cap ring), U.S. Trademark Registration No. 2,793,583 (contrasting color air cap ring), as well as SATA's Design Patent Nos. 459,432 S1 (green spray gun head ring), and 459,433 S1 (contrasting color spray gun head ring), set forth above.  Maier Decl. ¶ 16.  These product is identified as RF2000 AG.  *Id*.  A true and accurate photograph from the brochure is attached as Exhibit D to the Maier Declaration.

SATA also discovered paint spray guns being advertised and offered for sale that infringe upon SATA's Design Patent No. 644,716 for the ornamental design for a paint spray gun.  *Id.* at ¶ 17.  These products are identified as RF4000AG/ RF4000BG. *Id.*  A true and accurate photograph from the brochure is attached hereto as Exhibit E.

### C.     SATA Uncovers Infringing Activity At the SEMA Trade Show

The SEMA trade show is the nation's premier automotive specialty products trade event.  Maier Decl. ¶ 18.  Exhibitors at SEMA generate business (i.e., buy and sell products) and develop and maintain business relationships with key customers and suppliers.  SEMA is currently being held between Tuesday, November 3, 2015, and Friday, November 6, 2015, at the Las Vegas Convention Center in Las Vegas, Nevada, and features approximately 60,000 qualified buyers

1  and over 130,000 industry professionals.  *Id.*; *See also* SEMA's Website, available at

2  http://www.semashow.com/

3      **1.**  **SATA Discovers Infringing Activity At the SEMA Trade Show**

4    On November 3, 2015, SATA Representatives attended the SEMA trade show.  Maier

5  Decl. ¶ 20.  While at the show, the representatives visited several exhibitor booths, and observed

6  one company, PRONA, unlawfully offering for sale paint spray guns that infringe upon SATA's

7  U.S. Trademark Registration No. 3,072,417.  *Id.*  PRONA appears to be a Canadian based

8  distributor of a related Taiwan based company PRONA AIR TOOL MANUFACTURING, Ltd.

9  *Id.*  Neither company appears to have a known regular presence in the United States.  *Id.*  Once

10  SEMA is over (this Friday), PRONA will leave the United States, presumably with orders for

11  products that infringe SATA's trademarks, and will continue to sell infringing products from their

12  business locations in Canada and Taiwan to the United States.  *Id.*

13          ***PRONA's Infringing Conduct***

14    Defendant PRONA is currently advertising and offering paint spray guns and related

15  products for sale at SEMA Booth No. 11033. Maier Decl. ¶ 21.

16    PRONA is advertising and offering for sale, paint spray guns having a red band of color

17  extending around the circumference of the paint reservoir for a paint spray gun, that is located

18  directly under the screw cap.  *Id.* at ¶ 22.  These guns infringe upon SATA's U.S. Trademark

19  Registration No. 3,072,417 (for the Red Paint Cup Ring).  *Id.*  These products are identified as

20  RC-6R and RC-6M.  These specific products are incorporated with a number of other guns and

21  sold as units bearing the product numbers R301 G, R403 G, RL-403 G, R-1000G and R-3000 G.

22  *Id.*; Exhibit F.

23          **III.**  **ARGUMENT**

24    SATA is likely to succeed on the merits of its trademark counterfeiting, trademark

25  infringement and patent infringement claims.  Failure to issue a temporary restraining order, a

26  seizure order and a preliminary injunction will cause SATA to continue suffering irreparable

27  injury to its goodwill and reputation, will likely result in the loss of key evidence, and will most

28  certainly prevent SATA from obtaining any effective relief against Defendants.  The balance of

1  hardships tips in sharply in favor of SATA because it is suffering a loss of control over its

2  goodwill and reputation, while enjoining Defendants from selling infringing products should not

3  create any undue hardship.  Finally, granting the temporary restraining order, seizure order, and

4  preliminary injunction is in the public interest because doing so will protect consumers from

5  purchasing Defendants' infringing products.

## A.    THE APPLICABLE LEGAL STANDARDS

7      The Court has the authority to issue a seizure order, temporary restraining order and

8  preliminary injunction in this case under the Lanham Act, 15 U.S.C. § 1116, the Patent Act, 35

9  U.S.C. § 283, Rule 65 of the Federal Rules of Civil Procedure, and the Court's inherent authority.

10 Although Ninth Circuit law governs the trademark claims and Federal Circuit law governs the

11 patent claims, the factors used in determining whether to grant injunctive relief are essentially the

12 same.   The plaintiff must show:   (1) a reasonable likelihood of success on the merits; (2)

13 irreparable harm if an injunction is not granted; (C) the balance of hardships tips in plaintiff's

14 favor; and (4) injunctive relief is in the public's interest.  *See AstraZeneca LP v. Apotex, Inc.*, 633

15 F.3d 1042, 1049 (Fed. Cir. 2010); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7,

16 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008).  All of these factors weigh in favor of granting a

17 temporary restraining and seizure order and a preliminary injunction.  In addition, the Court has

18 the *inherent* authority to order seizure of the counterfeit goods and related evidence as discussed

19 below in Section VI.

## B.    SATA IS LIKELY TO SUCCEED ON THE MERITS AT TRIAL

### 1.    *SATA is Likely to Succeed on its Trademark Counterfeiting Claims*

22     To state a claim for trademark counterfeiting, the plaintiff must allege that:   (1) the

23 defendant infringed a registered trademark in violation of 15 U.S.C. § 1114; and (2) the defendant

24 intentionally used the mark knowing it was a counterfeit, as the term counterfeit is defined in 15

25 U.S.C. § 1116.  *See* 15 U.S.C. §§ 1114, 1116.  To meet that definition, "[s]ection 1116(d) requires

26 that the mark in question be (1) a non-genuine mark identical to the registered, genuine mark of

27 another, where (2) the genuine mark was registered <u>for use on the same goods to which the</u>

28 <u>defendant applied the mark</u>." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d

936, 945-46 (9th Cir. 2011); *see also Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005) (emphasis added).

Here, each Defendant is using the **exact trademarks** registered to SATA.  SATA's Marks are not complicated – they contain a colored band that is placed at a particular location on spray guns and related equipment.  As illustrated above, each Defendant is placing that exact same mark in the exact same place.  Moreover, each Defendant is using their counterfeit mark on paint spray guns, the exact type of good covered by SATA's trademarks.  Accordingly, Defendants' use of SATA Marks on products covered by SATA's federal trademark registrations (U.S. Trademark Registration Nos. 3,072,417, 2,770,801, and 2,793,583) constitutes trademark counterfeiting.  *See* 15 U.S.C. 1116(d)(1)(B); *see also Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005).

### 2.     *SATA is Likely to Succeed on its Trademark Infringement Claims*

Plaintiff is also likely to succeed on the merits of its trademark infringement claims at trial.  The core element of trademark infringement is the likelihood of confusion, *i.e.*, whether the similarity of the marks is likely to confuse customers about the source of the products.  *Brookfield Commc'ns v. West Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999) (quotation marks omitted).  In determining whether a likelihood of confusion exists, the Ninth Circuit generally considers eight factors:  (1) similarity of the marks; (2) the relatedness of the goods or services; (3) the strength of the allegedly infringed mark; (4) the degree to which the marketing channels converge; (5) the degree of care consumers exercise in purchasing the goods or services; (6) the defendant's intent in selecting the infringing mark; (7) evidence of actual confusion; and (8) the likelihood that the parties will expand their product lines.  *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), abrogated in part on other grounds by M*attel, Inc. v. Walking Mountain Prod.*, 353 F.3d 792 (2003); *see also Abercrombie & Fitch Co.*, 486 F.3d 629, 633 (9th Cir. 2007) (listing the "Sleekcraft factors").  The test for unfair competition is the same test as the test for trademark infringement.  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).

Although each of the *Sleekcraft* factors is potentially important in determining the likelihood of confusion, courts need not analyze each factor to reach a conclusion. *Brookfield*, 174 F.3d at 1054; *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011) ("The *Sleekcraft* factors are intended as an adaptable proxy for consumer confusion, not a rote checklist."); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) ("This eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts."); *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990) ("These tests were not meant to be requirements or hoops that a district court need jump through to make the determination.").

In cases like this, where two marks are identical or nearly identical and are used for the same goods or services, courts have found that a likelihood of confusion is inevitable even if the other six factors weigh against such a finding. *Brookfield*, 174 F.3d at 1056 ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course."); *New West Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1202 (9th Cir. 1979) (holding identical names, products, and distribution areas compelled conclusion that confusion was likely).   In this case, each Defendant is using marks that are identical or nearly identical to the SATA Marks for the same goods.  Each Defendant is using a color band in the exact same location as SATA and each Defendant is using such marks on paint spray guns, the very item that SATA's federally registered trademarks are intended to cover. Confusion is inevitable.  In addition, the other *Sleekcraft* factors strongly support the conclusion that confusion is likely.[1]

a.    A Likelihood of Confusion Exists.

"[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000), abrogated

---

[1] Beyond the likelihood of confusion, it is important to note that SATA has been successful when faced with similar burdens of proof on similar or identical marks.  This demonstrates a likelihood of success on the merits. Maier Decl. ¶ 23;  *see also SATA GmbH & Co. KG v. Wenzhou T&E Industrial Co., Ltd. et al, 2:13-CV-02042 (D. Nev. 2013)*; *SATA GmbH & Co. KG v. Wenzhou New Century International, Ltd. et al, 2:15-CV-08157 (C.D. CA. 2015)*.

on other grounds by *Winter*, 555 U.S. at 22.  Similarity is determined based on sight, sound and meaning and overall commercial impression of the marks as they appear in the marketplace.  *Id.*  The degree of similarity required to create a likelihood of confusion is incapable of exact general definition.  4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:20 (4th ed. 2006 & Supp. 2015).  However, "[o]ne thing is very clear:  'exact similitude is not required' between the allegedly confusing marks.  *Id.*  (quoting *McLean v. Fleming*, 96 U.S. 245, 24 L. Ed. 828 (1878)).  "As the Supreme Court has stated:  'It is not necessary to constitute an infringement that every word of a trademark would be appropriated.  It is sufficient that enough be taken to deceive the public in the purchase of a protected article.'"  *Id.*  (quoting *Saxlehner v. Eisner Mendelson Co.*, 179 U.S. 19, 33 (1900)).  When there are small differences between the marks, the differences may be *de minimis* when compared to the similarities.  *Id.*  Thus, it is not necessary to use an exact copy of another's mark for a likelihood of confusion to arise.  *Id.*

Again, each Defendant is using a color band in the exact same location on spray paint guns as SATA and each Defendant is using that mark on paint spray guns, the very item that SATA's federally registered trademarks are intended to cover.  The remaining factors favor a finding of confusion as well.  The strength of SATA's marks is undeniable when it has been using them for over a decade.  The marketing channels will collide as both SATA and the Defendants sell products worldwide.  Indeed, both SATA and Defendants are attending the same trade show at this very time.  Customers will be easily misled by a counterfeit product that bears the same mark as SATA.  Defendants' precise use of SATA's identical marks demonstrates their bad intent.  Actual confusion, while not yet fully explored, will likely result given the copycat nature of the infringing marks.  Defendants and SATA are in the same industry, so expansion of product lines is inevitable.

### 3.      *SATA is Likely to Succeed on its Patent Infringement Claims*

At this stage, SATA need only establish a reasonable likelihood that it will prevail on the merits of its patent infringement claims by a preponderance of evidence that Defendants have infringed the SATA Patents.  *See Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326-27 (Fed. Cir. 2008) (stating that, to prove infringement, the patentee has the burden of persuasion by

a preponderance of the evidence).   The SATA Patents are presumed valid.   *See Advanced Commc'n Design, Inc. v. Premier Retail Networks, Inc.*, 46 Fed. Appx. 964, 983 (Fed. Cir. 2002). Furthermore, validity is supported, for example, by showing that the patent in suit had successfully withstood previous validity challenges in other proceedings.   Validity may also be based on a showing that the patent enjoyed a long period of industry acquiescence.   *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001).[2]

Infringement of a design patent occurs when the accused design is substantially the same as the design patent's claim under the ordinary observer test.   *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 683 (Fed. Cir. 2008).   The ordinary observer test provides that "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same . . . the first one patented is infringed by the other."   *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2011) (quoting *Gorham Co. v. White*, 81 U.S. 511, 528 (1871)).   The focus must be on the overall design.   *Id.*   "Although individual features may affect the overall appearance, "in determining whether apparently minor differences between specific features would be recognized as distinguishing the designs, it is often helpful to refer to any prior art with which the ordinary observer would reasonably be familiar."   *Id.*   (reversing district court's order denying a motion for preliminary injunction and remanding for further consideration in light of Federal Circuit criteria).

The ordinary observer test is satisfied here.   It is glaringly obvious that the WUFU's paint spray guns and paint spray gun reservoirs embody the designs set forth in SATA's design patents and that the Defendants' product designs are substantially similar to the designs set forth in SATA's design patents.   As seen by the comparison charts in the Maier Declaration, WUFU's infringing products are exact duplicates of the designs set forth in the SATA Patents, right down to the two small holes in the upper part of the handle.   Compare Ex. E with USD 644,716, Figure 1 at Section II(A)(2), *supra*.   "When the patented design and the design of the article sold by the patentee are substantially the same, it is not error to compare the patentee's and the accused

---

[2] Again, SATA has asserted the '432 and the '433 patents with successful resolution, and these patents were issued in 1999.   The '716 patent, while newer, has never had its validity challenged.

articles directly." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1125-26 (Fed. Cir. 1993).   Indeed, "[s]uch a comparison may facilitate application of the *Gorham* criterion of whether an ordinary purchaser would be deceived into thinking that one were the other." *Id.* Here, the exceptionally strong similarities between SATA's patented designs and Defendants' counterfeit and infringing products clearly demonstrate SATA's likelihood of success on the merits of its patent infringement claims.

## C.   SATA IS LIKELY TO SUFFER IRREPARABLE INJURY

### 1.   *Irreparable Injury Will Result from Defendants' Conduct*

If Defendants are allowed to promote and sell their counterfeit and infringing products at AAPEX and SEMA and then flee to China or Taiwan to fill sales orders and build additional business, SATA will be deprived of evidence needed to establish the nature and extent of its injuries, including long-term loss of market share and concomitant erosion of exclusive patent and trademark rights.   Maier Decl. ¶¶ 13, 20.   Courts in similar situations have granted temporary and preliminary injunctive relief because these injuries cannot be readily quantified:

> Competitors change the marketplace.   Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction.   Customers may have established relationships with infringers.   The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat.

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir.1996).

In addition, Defendants are eroding and devaluing SATA's intellectual property rights thereby risking injury to SATA's goodwill and reputation.   *See, e.g., Farmer Brothers Co. v. Albrecht*, No. 2:11–CV–01371–PMP–CWH, 2011 WL 4736858, at *3 (D. Nev. 2011) ("Loss of customers or goodwill constitutes irreparable harm . . ."); *Tile Outlet Always In Stock, Inc. v. Big Leaps, Inc.*, No. 3:10–CV–0618–LRH–VPC, 2010 WL 5239229, at *3 (D. Nev. 2010) (irreparable injury exists when continuing infringement will result in loss in plaintiff's reputation and goodwill); *Florist's Transworld Delivery v. Worldwide Flower & Gift Emporium*, No. CV-S-97-513-LDG (LRL), 1998 U.S. Dist. LEXIS 7818, at *8 (D. Nev. 1998) ("Any dissatisfaction by such customers could not be measured or remedied by plaintiff, thus affecting plaintiff's

1  goodwill."); *see also Gallagher Benefit Servs., Inc. v. De La Torre*, 283 Fed. App'x 543, 546 (9th

2  Cir. 2008) (potential loss of goodwill and customers causes irreparable injury). If Defendants'

3  goods are of poor quality (and indeed, given SATA's products are known for their high quality

4  (Maier Decl. ¶¶ 4-5), it is near guaranteed that Defendants' products are inferior) this will reflect

5  adversely upon SATA's business good will and reputation. Maier Decl. ¶ 25. Similarly, in patent

6  cases, "[h]arm to reputation resulting from confusion between an inferior accused product and a

7  patentee's superior product is a type of harm that is often not fully compensable by money

8  because the damages caused are speculative and difficult to measure." *Reebok International Ltd.*

9  *v. J. Baker, Inc.*, 32 F.3d 1552, 1554 (Fed. Cir. 1994), abrogated on other grounds, *eBay Inc.*, 547

10 U.S. 388, 126 S.Ct. 1837 (2006).

11 Finally, because Defendants are foreign companies with no regular U.S. presence (Maier

12 Decl. ¶ 13), any monetary judgment would most likely be uncollectible. *See Robert Bosch, LLC*

13 *v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011), *vacated and remanded on other*

14 *grounds*, 521 F.3d 1351 (Fed. Cir. 2008) (finding irreparable harm where "'all three Defendant

15 are foreign corporations and that there is little assurance that [plaintiff] could collect monetary

16 damages'")); *Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 2d 1241, 1263 (D. Kan. 2009) (granting

17 preliminary injunction where "the prospect of collecting money damages from a foreign

18 defendant with few to no assets in the United States tips in favor of a finding of irreparable

19 harm").

20 Accordingly, SATA has already suffered and will continue to suffer irreparable injury

21 unless and until Defendants are temporarily and preliminarily enjoined.

22 **D.     THE BALANCE OF HARDSHIPS WEIGHS IN SATA'S FAVOR**

23 The balance of hardships tips in SATA's favor for at least three reasons. First, because

24 SATA has already suffered and will continue to suffer the extensive irreparable harm described

25 above absent an injunction. *NIKE, Inc.*, 2006 WL 3883278, at *3 (if defendant is not enjoined,

26 "NIKE will be severely handicapped in its ability to prevent further importation of infringing

27 products, thereby destroying any potential of preserving the status quo pending a resolution of

28 this case on its merits.").

Second, SATA's reputation will be harmed if Defendants are allowed to continue to manufacture and sell their infringing products because SATA will be unable to effectively police the market and enforce its intellectual property rights. *See California Med. Prods., Inc. v. Emergency Med. Prods., Inc.*, 796 F. Supp. 640, 647 (D.R.I. 1992) (denial of preliminary relief can damage patentee's reputation); *see also Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1028-29 (C.D. Cal. 2011) (holding that balance of hardships favored trademark owner who would suffer harm to its goodwill and reputation absent a preliminary injunction). It is difficult to earn respect in the marketplace among competitors if intellectual property rights are not enforced by the courts. This is particularly true here, where, as described above, Defendants' contacts with the United States are premised upon its infringing conduct, including promotions, sales, and offers to sell Infringing Products at the AAPEX and SEMA trade shows. If SATA cannot effectively enforce its patent and trademark rights against the Defendants while they are present in the United States attending the trade shows and actively engaged in counterfeiting and infringement, SATA's trademarks and patents will be of little value in the marketplace.

Third, in similar circumstances, courts have concluded that the existence of a non-infringing alternative that the defendant can sell in place of the infringing product tips the balance of hardships strongly in the plaintiff's favor. *See, e.g., Henkel Corp. v. Coral, Inc.*, 21 U.S.P.Q.2d 1081, 1101 (N.D. Ill. 1990) (injunction granted where defendant can switch to selling a non-infringing product even though it is required to raise its prices, or reduce its profit); *MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, 505 F. Supp. 2d 359, 379 (S.D. Tex. 2007) (holding that injunction against selling infringing products should not impose an unreasonable hardship where defendant already sold a non-infringing alternative). Because the SATA Patents protect only the ornamental features of the subject designs and the SATA Trademarks protect against use of the same or similar marks, Defendants have a broad choice of non-infringing designs and non-infringing trademarks to choose from to develop and sell non-infringing products. Indeed, SATA has spent considerable time and effort to pinpoint and identify the specific products that infringe its intellectual property rights and has identified them here. SATA is not looking to halt Defendants' entire business at the trade shows (indeed, by the time a seizure occurs, it would

1  likely be the last day of the show anyway), merely to remove any identifiable infringing products

2  from the shelves and obtain records of infringing product sales.

3      More importantly, any harm to Defendants that could possibly result from a temporary

4  restraining order, a seizure order, and a preliminary injunction is self-inflicted.  Defendants took a

5  calculated risk when they willfully copied SATA's trademarks and product designs and then

6  came to the United States to advertise and offer to sell infringing products at the trade shows in

7  blatant violation of U.S. law.  Under such circumstances, courts refuse to assign any "harm" to

8  the defendant because it assumed the risk.  *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, No. 2010-

9  1547, 2012 WL 34381, *8 (Fed. Cir. 2012) (affirming grant of preliminary injunction, stating that

10  "the preliminary record suggests that [defendant's] losses were the result of its own calculated

11  risk in selling a product with knowledge of [plaintiff's] patent").  Accordingly, the balance of

12  hardships strongly tips in SATA's favor.

13      **E.    THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF**

14      The public interest strongly favors granting injunctive relief for two reasons.  First, public

15  policy favors protection of the rights secured by valid patents, including the right to prevent

16  infringement through preliminary relief.  *NIKE*, 2006 WL 3883278, at *3 ("the public interest is

17  clearly served by seeing that patents are enforced").  Likewise, in the trademark context, courts

18  often define the public interest as the right of the public not to be deceived or confused from

19  competing uses of a trademark.  *See Creative Labs, Inc. v. Cynix Corp.,* 141 F.3d 1174 (9th Cir.

20  1998) (holding that the public interest is served where the imposition of injunctive relief would

21  prevent consumer confusion); *see also Tile Outlet*, 2010 WL 5239229, at *3.  Here, an injunction

22  not only protects SATA's interest in maintaining control over its trademarks and avoiding injury

23  to its reputation and goodwill, but it also protects the public from consumer confusion.  Maier

24  Decl. 25; *Brookfield*, 174 F.3d at 1066 ("preliminary injunctive relief is appropriate . . . to

25  promote the public interest in protecting trademarks generally.").

26      Second, enjoining Defendants' infringing activities will not harm the public.  There are

27  many other spray guns and related equipment on the market.  The public will still be able to

28  purchase those other non-infringing spray guns and related products, despite an injunction against

Defendants. *MGM Well Servs.*, 505 F. Supp. 2d at 379 (granting injunction on products for which alternatives were available in the market); *National Presto Indus. Inc. v. Dazey Corp.*, 18 U.S.P.Q.2d 1113, 1121 (N.D. Ill. 1990) (granting TRO where the public has plenty of substitutes including plaintiff's products). As SATA noted, its representatives visited several booths at both shows and only found two infringing companies. Maier Decl. ¶¶ 13, 20. Moreover, SATA is not seeking a broad injunction to prohibit all sales of paint spray guns – merely those that bear SATA's registered trademarks and violate SATA's design patents. Thus, the public interest favors granting preliminary injunctive relief.

**F.      THE COURT SHOULD ENTER A SEIZURE ORDER**

As part of any temporary restraining order the Court may enter, the Court should also enter a seizure order to prevent further infringements and injury to SATA and to permit SATA to obtain records of infringing product sales. There are two independent bases for entering a seizure order.

First, Section 34 of the Lanham Act, 15 U.S.C. § 1116(d), expressly permits the Court to grant an *ex parte* order for the seizure of counterfeit goods. SATA has satisfied each of the statutory prerequisites for obtaining such an order. *See* 15 U.S.C. § 1116(d)(4)(B). Specifically, an *ex parte* seizure order is necessary here because Defendants are likely to conceal evidence of their infringements and flee the jurisdiction upon notice of this suit. Maier Decl. ¶¶ 13, 20, 25 Defendants have apparently willfully used counterfeit trademarks on counterfeit goods in flagrant violation of U.S. law. SATA has suffered and will continue to suffer immediate and irreparable injury if Defendants are not enjoined. SATA's representatives and undersigned counsel observed the evidence that the Defendants were advertising or offering to sell infringing products at Defendants' trade show booths on the first day of the show. In addition, the balance of hardships tips decidedly in SATA's favor. Finally, SATA has not publicized the seizure. SATA only learned of the Defendants' infringing products when it attended the first day of the AAPEX and SEMA trade shows. Based on Defendants' blatant counterfeiting and infringement and the lack of any domestic presence, it is highly likely that Defendants would conceal evidence of their infringements and default if provided notice of this action. Maier Decl. ¶¶ 13, 20.

Second, in addition to the authority granted by the Lanham Act, the Court has the inherent power to order a seizure. *See* Fed. R. Civ. P. 64; *see also Reebok Int'l Ltd. v. Marnatech Enterprises Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) (district courts have inherent power to issue provisional remedies ancillary to providing final equitable relief, issuing injunction and freezing assets in trademark case); *NIKE, Inc. v. QiLoo Intern'l Ltd.*, 2:12-cv-00223 (D. Nev. 2012) (ordering seizure in patent case); *Lifetime Products, Inc. v. Ningbo Wanxiang Plastics Products Co.*, 2:10-cv-01166 (D. Nev. 2010) (same); *NIKE, Inc. v. Meitac Int'l*, No. 2:06-00943-PMP-PAL, 2006 WL 3883278 (D. Nev. 2006) (same); *Agio Int'l Co. v. Bond Mfg. Co.*, 2:04-cv-01373 (D. Nev. 2004) (same).

SATA respectfully submits a proposed order in the form required by 15 U.S.C. § 1116(d)(5). The proposed seizure order authorizes the United States Marshals Service, along with SATA's attorneys, paralegals, and representatives, to seize Defendants' infringing products, Defendants' records (including computers and electronic evidence of promotions, sales, and offers to sell infringing products), and Defendants' promotional display(s), sales equipment, and materials used to facilitate its infringements at the AAPEX and SEMA trade shows. SATA's counsel will have any paper or electronic documents and the originals returned to the Defendants as fast as possible and will not share any of the information obtained with SATA until Defendants have had the opportunity to challenge the seizure.

### G.     THE COURT SHOULD GRANT A TRO AND PRELIMINARY INJUNCTION

In addition to granting the seizure order, the Court should grant SATA's proposed temporary restraining order and proposed preliminary injunction. SATA seeks temporary and preliminary injunctive relief prohibiting Defendants from using any reproduction, counterfeit, copy, or colorable imitation of the SATA Marks in violation of 15 U.S.C. § 1114 and 1116(d), including, but not limited to, at the 2015 AAPEX trade show and SEMA Show in Las Vegas, Nevada. SATA further seeks temporary and preliminary injunctive relief prohibiting Defendants from making, using, offering for sale, selling or importing products that infringe the SATA Patents. 35 U.S.C. §§ 171 and 289.

**H.      NOMINAL SECURITY IS SUFFICIENT TO PROTECT DEFENDANT**

If the Court requires security for the requested temporary restraining and seizure order, SATA requests that the Court require no more than $10,000, which SATA is prepared to immediately deposit with the Clerk of the Court.  Indeed, Defendants are engaged in selling products other than those that are the subject of this suit.  SATA's has taken great efforts to only identify those products which clearly infringe its trademark and patent rights, as detailed above. Accordingly, the seizure, the temporary restraining order, and the preliminary injunction will not result in Defendants being unable to sell non-counterfeit, non-infringing products at the AAPEX and SEMA trade shows.  Thus, the only potential financial loss that Defendants may suffer is lost sales of infringing products.

**I.      THE COURT SHOULD PERMIT SERVICE VIA EMAIL AND FEDEX**

Finally, SATA requests that (in addition to personal service at the trade shows) that the Court enter an order permitting SATA to serve the Summons, Complaint, SATA's present motion, the Maier Declaration, any temporary retraining and seizure order the Court may enter, and any hearing or briefing schedule the Court may enter, upon each of the Defendants via email and via Federal Express.

If the Court grants SATA's request for a temporary restraining order, the order would only remain in effect for ten (10) days and the hearing on the preliminary injunction must occur "at the earliest possible time" prior to the expiration of the temporary restraining order.  Fed. R. Civ. P. 65(b).  The process of serving Defendants with the summons, complaint, motion, temporary restraining and seizure order, and notice of hearing on SATA's motion for preliminary injunction by other means would take days or weeks.  Service upon Defendants through other means would not provide Defendants with timely notice of the preliminary injunction hearing.

The Ninth Circuit has permitted service by email under similar circumstances.  *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1018-19 (9th Cir. 2002) (permitting email service on foreign owner of a domain name that could not be served in the United States).  Each of the Defendants provided business cards with email addresses.  SATA therefore requests that the Court enter an order permitting it to serve Defendants with a copy of the documents

referenced above by transmission to the email address provided by Defendants on their business cards (Maier at ¶ 13, 19 & WUFU's Business Card at Ex. C and Defendant's Brochure at Ex. E), and by Federal Express to the physical addresses listed on the above documents.  Finally, SATA requests that any such order state that such service is sufficient under the Federal Rules of Civil Procedure.

## IV.   CONCLUSION

For the reasons set forth above, SATA respectfully requests that the Court enter a temporary restraining and seizure order and a preliminary injunction against each of the Defendants in the manner requested.

Dated:  November 4, 2015

Respectfully submitted,

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By: /s/ Steven A. Caloiaro
     Michael D. Rounds, Esq., Bar No. 4734
     Steven A. Caloiaro, Esq,. Bar No. 12344
     5371 Kietzke Lane
     Reno, NV 89511

     *Attorneys for Plaintiff*
     *SATA GmbH & Co. KG*

In accordance with Local Rule 6-2(a):

IT IS SO ORDERED

_____

UNITED STATES DISTRICT JUDGE